<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

_____
                                                                    :
DUKE UNIVERSITY, ALLERGAN, INC., :
And ALLERGAN SALES, LLC,                    :
                                                                    :        Case No. 3:18-cv-14035-BRM-TJB
                Plaintiffs and                              :
                Counterclaim-Defendants,          :
                                                                    :
        v.                                                         :
                                                                    :                    **OPINION**
AKORN, INC. and HI-TECH                        :
PHARMACAL CO., INC.,                             :
                                                                    :
                Defendants and                         :
                Counterclaim-Plaintiffs.            :
_____:

**MARTINOTTI, DISTRICT JUDGE**

        Before this Court is Plaintiff/Counterclaim-Defendants Duke University ("Duke"),

Allergan, Inc. ("Allergan"), and Allergan Sales, LLC's ("Allergan Sales") (collectively,

"Plaintiffs") Motion to Dismiss Defendant/Counterclaim-Plaintiff Akorn, Inc.'s ("Akorn")

antitrust and patent misuse counterclaims and to strike the related affirmative defenses, or in the

alternative, to bifurcate and stay Akorn's counterclaims and affirmative defenses. (ECF No. 22.)

Akorn filed an Opposition to Plaintiffs' Motion to Dismiss (ECF No. 26) and Plaintiffs filed a

Reply Brief to Akorn's Opposition to its Motion to Dismiss (ECF No. 27). Having reviewed the

submissions filed in connection with the motions and having declined to hold oral argument

pursuant to Federal Rule of Civil Procedure 78(b), for the reasons set forth below and for good

cause appearing, Plaintiffs' Motion to Dismiss the Counterclaims and Affirmative Defenses is

**GRANTED** and Plaintiffs' Motion to Bifurcate and Stay the proceedings is **DENIED AS MOOT**.

I.   **BACKGROUND**

   **A. Factual Background**

For the purposes of this Motion to Dismiss, the Court accepts the factual allegations in the Amended Complaint – or in this case, the allegations in the Counterclaim – as true and draws all inferences in the light most favorable to the non-moving party. *See Phillips v. Cty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). Furthermore, the Court also considers any "document *integral to or explicitly relied upon* in the complaint." *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (quoting *Shaw v. Dig. Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996)).

Duke is an educational, research, and healthcare institution located in Durham, North Carolina, Allergan is a Delaware corporation with its principal place of business in Irvine, California, and Allergan Sales is a Delaware limited liability company with its principal place of business in Madison, New Jersey. (ECF No. 1 ¶¶ 1-3.) Akorn is a Louisiana corporation with its principal place of business in Lake Forest, Illinois, which also maintains a registered agent for process in Ewing, New Jersey. (*Id.* ¶ 4.) Hi-Tech, a wholly owned subsidiary of Akorn since 2014, is a Delaware corporation with its principal place of business in Amityville, New York. (*Id.* ¶¶ 5-6.)

Allegan is the corporate parent company of Allergan Sales (collectively, "Allergan"), which is the holder of the Abbreviated New Drug Application ("ANDA") No. 22-369 for LATISSE ® ("Latisse"). (ECF No. 1 ¶ 35.) Latisse is a bimatoprost[1] ophthalmic solution, 0.03%,

---

[1] Bimatoprost is a synthetic $PGF_{2\alpha}$ analog which differs structurally from $PGF_{2\alpha}$ in two respects: bimatoprost contains an ethyl amide at the C-1 position whereas $PGF_{2\alpha}$ contains a carboxylic acid at the C-1 position, and the omega chain of bimatoprost is shortened by three carbons compared to $PGF_{2\alpha}$ and contains a phenyl group at the C-17 position. (ECF No. 1 ¶ 28.) Unlike $PGF_{2\alpha}$, which binds to the FP receptor, bimatoprost binds only to a splice variant of the FP receptor known as the prostamide receptor. (*Id.* ¶ 29.) Therefore, Plaintiffs allege bimatoprost has a different

which is used to treat hypotrichosis of the eyelashes by increasing their length, thickness, and darkness. (*Id.* ¶¶ 35-36.)[2] On February 28, 2017, the United States Patent and Trademark Office ("USPTO") issued U.S. Patent No. 9,579,270 (the "'270 Patent"), entitled "Compositions and Methods for Treating Hair Loss Using Non-Naturally Occurring Prostaglandins," to Duke. (*Id.* ¶¶ 18-19.) Allergan holds an exclusive license to the '270 Patent. (*Id.* ¶ 20.)

Akorn, through Hi-Tech, submitted ANDA No. 203051 pursuant to § 355(j)(2)(B)(ii) of the Federal Food, Drug and Cosmetic Act ("FDCA"), and upon receiving approval, "will manufacture, sell, offer to sell, and/or import Akorn's proposed generic bimatoprost product in the United States." (*Id.* ¶ 15.)

Since 2011, Allergan has brought several lawsuits against "various generic manufacturers' submissions of . . . ANDAs under section 505(j) of the FDCA." (*Id.* ¶ 42.) Relevant to this matter, Plaintiffs have brought four lawsuits – three of which Duke has joined – alleging infringement of patents covering Latisse, and specifically alleging infringement by Akorn's ANDA No. 203051. (ECF No. 1 ¶¶ 41-50.) These lawsuits include: *Allergan, Inc., et al. v. Hi-Tech Pharmacal Co., Inc.*, Case No. 1:11-cv-650, filed in the Middle District of North Carolina ("*Latisse I*"); *Allergan, Inc. v. Apotex, Inc., et al.*, Case Nos. 1:12-cv-247 and 1:13-cv-16, filed in the Middle District of

---

pharmacological activity than $PGF_{2\alpha}$ and $PGF_{2\alpha}$ analogs with C-1 carboxylic acid groups. (*Id.* ¶ 31.)

[2] The FDA approved Latisse in 2008. (ECF No. 1 ¶ 37.) Before that approval, the FDA had sanctioned only two other hair growth agents in its history, minoxidil (Rogaine®) and finasteride (Propecia®). (*Id.*) Both of these products are approved for growth of hair on the scalp, not eyelash hair. (*Id.*) Latisse "has been a commercially successful product for Allergan, resulting in net sales for Allergan of over $70 million annually since its launch in 2009." (*Id.* ¶ 38.)

North Carolina ("*Latisse II*"); and *Allergan, Inc. v. Sandoz, Inc., et al.*, Case No. 1:14-cv-1034, filed in the Middle District of North Carolina ("*Latisse III*").[3]

### i.    *Latisse I*

On August 17, 2011, Allergan and Duke filed a complaint against Hi-Tech asserting infringement of U.S. Patent Nos. 7,531,404 (the "'404 Patent") and 7,388,029 (the "'029 Patent") by Akorn's proposed ANDA Product. (ECF No. 8 ¶ 34); Case No. 1:11-cv-650, ECF No. 1. On January 24, 2013, the United States District Court for the Middle District of North Carolina issued an opinion determining, *inter alia*, that Hi-Tech infringed the patents and entered judgment in favor of the plaintiffs. Case No. 1:11-cv-650, ECF No. 95. On June 10, 2014, the Federal Circuit reversed the district court's decision, holding that the asserted claims of the '029 and '404 Patents were invalid as obvious and were invalid over two prior art references: PCT Application No. PCT/US98/02289 ("Johnstone") and U.S. Patent No. 5,688,801 (the "'819 Patent"). *Allergan, Inc. v. Apotex Inc.*, 754 F.3d 952, 966 (Fed. Cir. 2014); (ECF No. 8 ¶¶ 35-36.) Specifically, the Federal Circuit held it would have been obvious to use the family of compounds that includes bimatoprost to treat hair loss. *Allergan*, 754 F.3d at 962-66. Moreover, the Federal Circuit found the '029 Patent asserted claims that included "thousands of permutations of synthetic [prostaglandin F-2-alpha ("PGF")] analogs," and not just bimatoprost, which is only one such analog. *Id.* at 962.

Plaintiffs' request for an *en banc* re-hearing in *Latisse I* was denied. (ECF No. 8 ¶ 37.) Thereafter, the district court entered a final judgment declaring the invalidity of the asserted claims of the '029 and '404 Patents and non-infringement by Akorn's Proposed ANDA Product. (*Id.* ¶ 38.)

---

[3] The instant case is included as one of the four cases brought by Allergan against Akorn since 2011 and is referenced as "*Latisse IV*" in the parties' briefing.

### ii. *Latisse II*

On March 13, 2012, while *Latisse I* was pending, Plaintiffs[4] filed *Latisse II* in which they asserted additional patent infringement claims against several defendants, including Akorn, alleging infringement of: U.S. Patent No. 8,263,054 (the "'054 Patent"); U.S. Patent No. 8,038,988 (the "'988 Patent"); and U.S. Patent No. 8,101,161 (the "'161 Patent"). (ECF No. 8 ¶ 39); Case Nos. 1:12-cv-247 and 1:13-cv-16, ECF No. 1. The *Latisse II* court held that the '988 Patent, the '161 Patent, and the '054 Patent are related to, and recite substantially the same subject matter as, the '404 Patent that was invalidated in *Latisse I*. (*Id.* ¶ 40.) Accordingly, the court entered a final judgment in which it declared the '988, '161, and '054 Patents invalid as obvious under 35 U.S.C. § 103, and further held that in light of the Federal Circuit's finding of invalidity of the '404 Patent in *Latisse I*, Allergan was collaterally estopped from asserting the '988, '161, and '054 Patents against Apotex or from contesting their validity. (*Id.* ¶ 41); Case Nos. 1:12-cv-247 and 1:13-cv-16, ECF No. 114.[5] Allergan did not appeal the court's order of dismissal or its underlying holding that Allergan be collaterally estopped from asserting or contesting the invalidity of the patent claims in *Latisse II*. (ECF No. 8 ¶ 43.)

### iii. *Latisse III*

On December 10, 2014, several months after the Federal Circuit's decision in *Latisse I*, Plaintiffs filed *Latisse III* in which they contended the bimatoprost product included in Akorn's Proposed ANDA Product infringed U.S. Patent No. 8,906,962 (the "'962 Patent") and U.S. Patent

---

[4] Duke was not a party to *Latisse II*.

[5] While the court held that Allergan was collaterally estopped from asserting the '988, '161, and '054 Patents against Apotex, it also determined the case was not "exceptional" pursuant to 35 U.S.C. § 285 and accordingly declined to award attorney's fees to Apotex. *Latisse II*, Case Nos. 1:12-cv-247 and 1:13-cv-16, ECF No. 114, ¶ 5.

No. 8,926,953 (the "'953 Patent"). (ECF No. 8 ¶ 44); Case No. 1:14-cv-1034, ECF Nos. 1 & 15. On May 22, 2015, Plaintiffs filed an amended complaint in *Latisse III* in which they dropped their allegations of infringement of the '962 Patent, instead proceeding only with its claims of infringement of the '953 Patent. (ECF No. 8 ¶¶ 45-46); Case No. 1:14-cv-1034, ECF No. 47.

On August 31, 2015, the district court issued a final judgment declaring that Plaintiffs were collaterally estopped from asserting the '953 Patent against Akorn, or contesting its validity, pursuant to the decisions in *Latisse I* and *Latisse II*. (ECF No. ¶¶ 47-48); Case No. 1:14-cv-1034, ECF No. 72. Specifically, the district court noted "the '953 patent claims priority to, and substantially the same subject matter as, invalid '404 patent claim 14 and the relevant claims of the '054, '161, and '988 patents." Case No. 1:14-cv-1034,0 ECF No. 72 at 2. Accordingly, the district court dismissed the complaint with prejudice. *Id.*[6] On March 17, 2017, the Federal Circuit affirmed the district court's ruling in *Latisse III*, determining that collateral estoppel prevented Plaintiffs from asserting the '029, '404, '054, '988, '161, and '953 Patents. (ECF No. 8 ¶ 49); *Allergan, Inc. v. Sandoz, Inc.*, 681 F. App'x 955, 958 (Fed. Cir. 2017).

### iv.    Current Litigation (*Latisse IV*)

In February 2017, the USPTO issued the '270 Patent, which covered methods of using Latisse and claimed priority to the application that led to the '029 Patent invalidated in *Latisse I*. (ECF No. 1 ¶¶ 18, 64.) Plaintiffs allege infringement of the '270 Patent, contending the "[a]sserted claims 22 and 30 of the '270 Patent," in contrast to the claims of the '029 Patent that were found obvious in the prior litigation, are "limited to prostaglandin compounds with an amide at the C-1 position," and that therefore, "the findings discussed by the Federal Circuit [concerning] the

---

[6] As in *Latisse II*, the district court denied Akorn's motion for attorney's fees, determining that Allergan's allegations were not objectively baseless or "exceptional" pursuant to 35 U.S.C. § 285. Case No. 1:14-cv-1034, ECF No. 97.

different behaviors of C-1 amides . . . including bimatoprost, are commensurate with the narrower scope of the asserted '270 Patent claims." (*Id.* ¶ 50.) In its counterclaims, Akorn alleges claims 22 and 30 of the '270 Patent are: substantially similar to claims 1, 8, 14, 18, and 20 of the '029 Patent and to claim 14 of the '404 Patent, which were invalidated as obvious in *Latisse I*; substantially similar to claims in the '988, '161, and '054 Patents which were invalidated on the basis of collateral estoppel in *Latisse II*; and substantially similar to claims 8, 20, and 23 of the '953 Patent, which was invalidated on the basis of collateral estoppel in *Latisse III*. (ECF No. 8 ¶¶ 58, 64, 65.)

### B.  Procedural History of This Action

On September 19, 2018, Plaintiffs filed a Complaint (the "Complaint") against Akorn and Defendant/Counterclaim-Plaintiff Hi-Tech Pharmacal Co., Inc. ("Hi-Tech") (collectively, "Defendants") asserting causes of action for: infringement of the '270 Patent pursuant to the 35 U.S.C. § 271(e)(2) (Count One); declaratory judgment of patent infringement pursuant to 35 U.S.C. § 271(b) (Count Two); and declaratory judgment of patent infringement pursuant to 35 U.S.C. § 271(c) (Count Three). (ECF No. 1.) On November 19, 2018, Akorn filed an Answer (the "Akorn Answer") to the Complaint in which it asserted counterclaims for: declaration of invalidity of the '270 Patent (Counterclaim One); declaration of non-infringement of the '270 Patent (Counterclaim Two); declaration of preclusion based on collateral estoppel (Counterclaim Three); actual monopolization: sham litigation in violation of 15 U.S.C. § 2 (Counterclaim Four); series of sham litigations in violation of 15 U.S.C. § 2 (Counterclaim Five); attempted monopolization in violation of 15 U.S.C. § 2 (Counterclaim Six); conspiracy to monopolize in violation of 15

U.S.C. §§ 1 and 2 (Counterclaim Seven); and declaration of unenforceability due to patent misuse (Counterclaim Eight). (ECF No. 8.)[7]

On January 11, 2019, Plaintiffs filed a Motion to Dismiss Counterclaims Four through Eight, or in the alternative, to bifurcate and stay Counterclaims Four through Eight and the related affirmative defenses. (ECF No. 22.) On February 4, 2019, Akorn filed an Opposition to Plaintiffs' Motion to Dismiss the Counterclaims or to Bifurcate and Stay the proceedings (ECF No. 26) and on February 13, 2019, Plaintiffs filed a Reply Brief to Akorn's Opposition to its Motion to Dismiss or to Bifurcate and Stay. (ECF No. 27).

## II. LEGAL STANDARDS

### A. Rule 12(b)(6)

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a district court is "required to accept as true all factual allegations in the complaint and draw all inferences in the facts alleged in the light most favorable to the [non-moving party]." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted).  However, the plaintiff's "obligation to provide the

---

[7] Additionally, Akorn also raised several affirmative defenses, which included: invalidity of the '270 Patent pursuant to 35 U.S.C. §§ 101, 102, 103, and/or 112 (Affirmative Defense One); the drug product described in ANDA No. 203051 has not infringed any enforceable claims in the '270 Patent (Affirmative Defense Two); Plaintiffs have not demonstrated standing (Affirmative Defense Three); Plaintiffs are barred from recovering costs associated with the suit pursuant to 35 U.S.C. § 288 (Affirmative Defense Four); the doctrines of *res judicata* and collateral estoppel bar Plaintiffs from re-litigating the final decisions in *Latisse II* and *Latisse III* concerning the obviousness of the subject matter of the '270 Patent (Affirmative Defense Five); the Complaint fails to state a claim for which relief may be granted (Affirmative Defense Six); Plaintiffs' assertions constitute patent misuse (Affirmative Defense Seven); Plaintiffs' assertions constitute a sham litigation (Affirmative Defense Eight); and Plaintiffs' assertions constitute a conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 (Affirmative Defense Nine). (ECF No. 8 at 23-25.)

'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan*, 478 U.S. at 286. Instead, assuming the factual allegations in the complaint are true, those "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for misconduct alleged." *Id.* This "plausibility standard" requires the complaint allege "more than a sheer possibility that a defendant has acted unlawfully," but it "is not akin to a probability requirement." *Id.* (quoting *Twombly*, 550 U.S. at 556). "Detailed factual allegations" are not required, but "more than an unadorned, the defendant-harmed-me accusation" must be pled; it must include "factual enhancements" and not just conclusory statements or a recitation of the elements of a cause of action. *Id.* (citing *Twombly*, 550 U.S. at 555, 557).

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)). However, courts are "not compelled to accept 'unsupported conclusions and unwarranted inferences,'" *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (quoting *Schuylkill Energy*

*Res. Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997)), nor "a legal conclusion couched as a factual allegation." *Papasan*, 478 U.S. at 286.

While, as a general rule, the court may not consider anything beyond the four corners of the complaint on a motion to dismiss pursuant to Rule 12(b)(6), the Third Circuit has held that "a court may consider certain narrowly defined types of material without converting the motion to dismiss [to one for summary judgment pursuant to Rule 56]." *In re Rockefeller Ctr. Props. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999). Specifically, courts may consider any "document *integral to or explicitly relied upon* in the complaint." *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (quoting *Shaw v. Dig. Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996)).

### B.  Rule 12(f)

Rule 12(f) permits a court, upon motion or *sua sponte*, to strike from a pleading an "insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "Because of the drastic nature of the remedy, however, motions to strike are usually 'viewed with disfavor' and will generally 'be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties, or if the allegations confuse the issues.'" *Garlanger v. Verbeke*, 223 F. Supp. 2d 596, 609 (D.N.J. 2002) (quoting *Tonka Corp. v. Rose Art Indus., Inc.*, 836 F. Supp. 200, 217 (D.N.J. 1993)).

Indeed, such remedy is to be invoked "only when required for the purposes of justice." *In re Gabapentin*, 649 F. Supp. 2d 340, 346 (D.N.J. 2009) (quoting *North Penn Transfer, Inc. v. Victaulic Co. of Am.*, 859 F. Supp. 154, 158 (E.D. Pa. 1994)). "Courts have, however, recognized that such motions may serve to hasten resolution of cases by eliminating the need for discovery which in turn saves time and litigation expenses." *Gabapentin*, 649 F. Supp. 2d at 346 (citation omitted); *see also F.D.I.C. v. White*, 828 F. Supp. 304, 307 (D.N.J. 1993). Courts have stricken

affirmative defenses as legally insufficient where the arguments therein had previously been raised and subsequently rejected by the court. *See Modern Creative Servs., Inc. v. Dell Inc.*, No. 05-3891, 2008 WL 305747, at *1 (D.N.J. Jan. 28, 2008). Rule 12(f) "does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Gabapentin*, 649 F. Supp. 2d at 346 (quoting *Phillips*, 515 F.3d at 234)).

### C. Bifurcation

Pursuant to Rule 42(b), a court may, for convenience or to expedite and economize the litigation, "order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims." Fed. R. Civ. P. 42(b). The "rule in [the Third Circuit] . . . has been that the decision to bifurcate . . . is a matter to be decided on a case-by-case basis and must be subject to an informed discretion by the trial judge." *Lis v. Robert Packer Hosp.*, 579 F.2d 819, 824 (3d Cir. 1978) (citing *Idzojtic v. Penn. R.R. Co.*, 456 F.2d 1228, 1230 (3d Cir. 1971)). "The party moving for bifurcation has the burden of showing that bifurcation is proper in light of the general principle that a single trial tends to lessen the delay, expense and inconvenience to all parties." *Huertas v. TransUnion*, Case No. 08-2009, 2009 WL 10697260, at *1 (D.N.J. Apr. 29, 2009).

### III.   DECISION

Plaintiffs contend: this Court should dismiss Counterclaims Four through Six because Akorn has failed to plausibly allege sham litigations as it cannot meet the high pleading burden to strip Plaintiffs of immunity pursuant to the *Noerr-Pennington* doctrine and the "Series Test" does not apply to Plaintiffs' lawsuits (ECF No. 22-1 at 9-18); this Court should dismiss Counterclaim Seven as Akorn fails to convert an ordinary patent license term into an unlawful conspiracy to monopolize claim (*id.* at 18-20); this Court should dismiss Counterclaim Eight as Akorn's bare

allegations of sham litigation cannot support a patent misuse claim (*id.* at 20-21); Akorn's Affirmative Defenses Seven through Nine – identical antitrust and patent misuse defenses to its counterclaims – should be stricken for the same reasons as it implores this Court to dismiss Counterclaims Four through Eight (*id.* at 21-22); and, in the alternative, this Court should bifurcate and stay Counterclaims Four through Eight and Affirmative Defenses Seven through Nine as it would promote judicial economy (*id.* at 22-29).

Akorn argues this Court should deny Plaintiffs' Motion to Dismiss the Counterclaims and Strike the Affirmative Defenses because: Plaintiffs do not challenge the majority of the elements required to establish monopolization counterclaims (ECF No. 26 at 10-11); it has sufficiently pled that Plaintiffs have pursued a series of sham litigations (*id.* at 11-18); it has sufficiently pled that Plaintiffs have engaged in sham litigation supporting its actual monopolization and conspiracy to monopolize claims (*id.* at 18-24); and for the same reasons, this Court should not strike its Affirmative Defenses (*id.* at 24-26). Additionally, Akorn claims this Court should deny Plaintiffs' Motion to Bifurcate because, *inter alia*, bifurcation is premature and would be inefficient and prejudicial. (*Id.* at 26-32.)

This Court addresses each argument in turn.

### A. Actual Monopolization, Sham Litigation, and Attempted Monopolization (Counterclaims Four through Six)

Plaintiffs contend Akorn cannot meet the high pleading standard to strip Plaintiffs of their *Noerr-Pennington* immunity because: Akorn does not allege that *Latisse I-III* were sham litigations; Plaintiffs had a reasonable basis from which to file all of the *Latisse* lawsuits; Plaintiffs prevailed in the district court in its suit in *Latisse I*; the district court determined that the lawsuits in *Latisse II* and *III* were not objectively baseless; and *Latisse IV* has yet to be adjudicated on the merits. (ECF No. 22-1 at 9-16.) Plaintiffs further contend that the "Series Test" does not apply to

12

their lawsuits. (*Id.* at 16-18.) Akorn argues this Court should deny Plaintiffs' Motion to Dismiss Counterclaims Four through Six because, *inter alia*, Plaintiffs do not challenge the majority of the elements required to establish Akorn's monopolization counterclaims and Akorn has adequately pled a series of sham litigation, maintaining Plaintiffs impute an erroneous legal standard in arguing the "Series Test" does not apply. (ECF No. 26 at 9-21.)

The *Noerr-Pennington* doctrine protects concerted efforts to restrain or monopolize commerce by petitioning the government, or the courts, from antitrust liability. *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499 (1988) (citing *Mine Workers v. Pennington*, 381 U.S. 657, 669-72 (1965)).[8] "Under the *Noerr-Pennington* doctrine, '[a] party who petitions the government for redress generally is immune from antitrust liability.'" *A.D. Bedell*, 263 F.3d at 250 (quoting *Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 122 (3d Cir.), *cert. denied*, 528 U.S. 871 (1999)). Such petitioning "is immune from liability even if there is an improper purpose or motive." *Id.*

However, there is a "sham" exception to the *Noerr-Pennington* doctrine which "holds that using the petitioning process simply as an anticompetitive tool without legitimately seeking a positive outcome to the petitioning destroys immunity." *Id.* n.29 (citing *City of Columbia v. Omni*

---

[8] "Rooted in the First Amendment" and with the intention to quell "fears about the threat of liability chilling political speech," the *Noerr-Pennington* doctrine immunizes parties "who attempted to influence government action – even where the petitioning had anticompetitive effect," from federal antitrust lawsuits. *A.D. Bedell Wholesale Co. v. Phillip Morris Inc.*, 263 F.3d 239, 250 (3d Cir. 2001). The importance of the right to petition the government has been "long recognized" in the common law tradition. *Id.* at 252. "As early as 1215, the Magna Carta granted barons the right to petition the King of England for redress." *Id.* (citing Julie M. Spanbauer, *The First Amendment Right to Petition Government for Redress of Grievances: Cut From a Different Cloth*, 21 HASTINGS CONST. L.Q. 15, 17 (1993)). Indeed, the "very idea of government, republican in form, implies a right on the part of its citizens to meet peaceably for consultation in respect to public affairs and to petition for a redress of grievances." *United States v. Cruikshank*, 92 U.S. 542, 552 (1875).

*Outdoor Advert., Inc.*, 499 U.S. 365, 380 (1991)). "A 'sham' situation involves a defendant whose activities are not genuinely aimed at procuring favorable government action at all, not one who genuinely seeks to achieve his governmental result, but does so through improper means." *Omni*, 499 U.S. at 381 (citations omitted). "[C]hallenges to allegedly sham petitioning activity must be resolved according to objective criteria." *Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 59 (1993).[9] The Supreme Court has "dispelled the notion that an antitrust plaintiff could prove a sham merely by showing that its competitor's 'purposes were to delay [the plaintiff's] entry into the market and even to deny it a meaningful access to the appropriate . . . administrative and legislative fora.'" *Id.* at 59-60 (quoting *Omni*, 499 U.S. at 381). Indeed, the Court reasoned that such intent "may render the manner of lobbying improper or even unlawful, but does not necessarily render it a sham." *Omni*, 499 U.S. at 381.

At the outset, Plaintiffs argue that Akorn fails entirely to allege that *Latisse I-III* were sham litigations. (ECF No. 22-1 at 10.) On the contrary, Akorn specifically alleges Plaintiffs "have conducted a series of sham proceedings" and have recited various elements of a sham proceeding in its counterclaims: Plaintiffs' legal filings were not made out of a genuine interest in redressing grievances; the filings are "part of a pattern or practice of successive filings undertaken for the purposes of harassment"; the lawsuits "were brought as part of an anticompetitive scheme"; and the lawsuits were not "legitimate petitioning[s] of the court." (ECF No. 8 ¶ 174.)

Although Akorn provides a recitation of the elements of a monopolization cause of action in alleging Plaintiffs' current lawsuit constitutes a sham, the facts it pleads are insufficient to vitiate the protections of the *Noerr-Pennington* doctrine. Therefore, Counterclaims Four through Six

---

[9] *Prof'l Real Estate Inv'rs* is abbreviated by the parties, as well as other courts, as *PRE*. This Court adopts this abbreviation hereinafter.

cannot withstand Plaintiffs' Motion to Dismiss.

Plaintiffs had a reasonable basis on which to file the lawsuits in *Latisse I-III* such that it is implausible that the lawsuits were filed merely as an "anticompetitive tool" while not genuinely seeking a positive outcome. *See Omni*, 499 U.S. at 380. Under the Patent Act, a patent is "presumed valid." 35 U.S.C. § 282(a). "Given the presumption of patent validity . . . it will be a rare case in which a patentee's assertion of its patent in the face of a claim of invalidity will be so unreasonable as to support a claim that the patentee has engaged in sham litigation." *Tyco Healthcare Grp. LP v. Mutual Pharm. Co., Inc.*, 762 F.3d 1338, 1345 (Fed. Cir. 2014). In fact, "[o]nly if the exacting standards of *PRE* are satisfied will the patentee lose its *Noerr-Pennington* immunity in that setting." *Id.* (citing *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1368-69 (Fed. Cir. 1998)). In *PRE*, the Court outlined the objective criteria for determining whether a litigant has instituted sham litigation, thereby abolishing *Noerr-Pennington* immunity, as follows:

> We now outline a two-part definition of "sham" litigation. First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr*, and an antitrust claim premised on the sham exception must fail. Only if the challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. Under the second part of our definition of sham, the court should focus on whether the baseless lawsuit conceals an attempt to interfere directly with the business relationships of a competitor . . . through the use of the governmental process – as opposed to the outcome of that process – as an anticompetitive weapon.

*PRE*, 508 U.S. at 60-61 (citations omitted).

Here, the lawsuits in *Latisse I-III*, as well as the Plaintiffs' current suit, are not objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. *Latisse I* cannot be said to have been objectively baseless as Plaintiffs prevailed at the district court

level before the decision was ultimately reversed on an appeal by a divided Federal Circuit. Case No. 1:11-cv-650, ECF No. 95; *Allergan, Inc. v. Apotex Inc.*, 754 F.3d 952, 966 (Fed. Cir. 2014); (ECF No. 8 ¶¶ 35-36.) The fact that Plaintiffs initially prevailed before the district court, and that the Federal Circuit's decision was split, destroys any notion that no reasonable litigant could realistically expect success. On the contrary, *Latisse I* was "hard-fought and close," and therefore cannot constitute sham litigation. *AstraZeneca AB v Mylan Labs., Inc.*, 2010 WL 2079722, at *4 (S.D.N.Y. May 19, 2010).

Similarly, *Latisse II* and *III* do not constitute sham litigations. An "essential" inquiry in determining whether a suit was a sham is not whether the suit ultimately succeeds, but rather, whether it was objectively baseless "at the time it was filed." *In re Wellbutrin XL Antitrust Litig.*, 868 F.3d 132, 148 (3d Cir. 2017) (citing *PRE*, 508 U.S. at 60 n.5). Plaintiffs filed *Latisse II* when *Latisse I* was still pending, and as such, none of Plaintiffs' patents had been declared invalid at the time. Even though *Latisse III* was filed after the opinion in *Latisse I* was issued, Plaintiffs voluntarily discontinued its infringement claims concerning the '962 Patent in *Latisse III* and prosecuted only its claims under the '953 Patent, which was not issued until January 2015. *Latisse III*, Case No. 1:14-cv-1034, ECF Nos. 15 & 47. As the '953 Patent was not issued until after the decisions in *Latisse I* and *II*, Plaintiffs cannot be charged with any knowledge of the invalidation of the '953 Patent, even if it did contain substantially similar claims as the '962 Patent. Accordingly, the assertion of claims in a patent whose validity has not yet been litigated cannot be said to be "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." *PRE*, 508 U.S. at 60.

Importantly, in both *Latisse II* and *III*, Akorn and/or its co-defendants moved for attorney's fees, arguing that Plaintiffs' claims were frivolous, and in both matters, the district court denied

16

the motions, determining Plaintiffs' conduct was not "exceptional" pursuant to 35 U.S.C. § 285.

*Latisse II,* Case Nos. 1:12-cv-247 and 1:13-cv-16, ECF No. 114, ¶ 5; *Latisse III*, Case No. 1:14-

cv-1034, ECF No. 97. Plaintiffs argue that the "exceptional case" standard in Section 285 is lower

than the sham litigation standard that applies here, and that as the district court already determined

that the lawsuits in *Latisse II* and *III* were not objectively baseless under this lower standard, then

they "cannot be objectively baseless under the more exacting *PRE* standard." (ECF No. 22-1 at

14-15.) Akorn counters that Plaintiffs "misconstrue the law by claiming that *Latisse II* cannot be

objectively baseless," and that because the standards between applying § 285 and determining

litigation to be a sham differ, the decision to deny attorney's fees in *Latisse II* and *III* cannot be

given preclusive effect to determine that the litigations do not constitute a sham. (ECF No. 26 at

17-18.)

In *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 551 (2014), the

Supreme Court explicitly drew a distinction between the "exceptional case" standard used in

adjudicating attorney's fees motions pursuant to § 285, and the "objectively baseless" standard

established by the Court in *Noerr-Pennington* and later clarified in *PRE*. The *Octane* Court began

by rejecting the fee-shifting standard established by the Federal Circuit in *Brooks*, 393 F.3d at

1381, which held that fees may be imposed against the patentee only if both (1) the litigation is

brought in subjective bad faith, and (2) the litigation is objectively baseless. *Octane*, 572 U.S. at

551. The Court determined this formulation was "overly rigid" as it "superimpose[d] an inflexible

framework onto statutory text [§ 285] that is inherently flexible." *Id.* at 555. The Court explained

its reasoning as follows:

> In *Brooks Furniture*, the Federal Circuit imported the *PRE* standard
> into § 285. But the *PRE* standard finds no roots in the text of § 285,
> and it makes little sense in the context of determining whether a case
> is so "exceptional" as to justify an award of attorney's fees in patent

litigation. We crafted the *Noerr-Pennington* doctrine – and carved out only a narrow exception for "sham" litigation – to avoid chilling in the exercise of the First Amendment right to petition the government for redress of grievances . . . But to the extent that patent suits are similarly protected as acts of petitioning, it is not clear why the shifting of fees in an "exceptional" case would diminish that right. The threat of antitrust liability (and the attendant treble damages, 15 U.S.C. § 15) far more significantly chills the exercise of the right to petition than does the mere shifting of attorney's fees.

. . .

Finally, we reject the Federal Circuit's requirement that patent litigants establish their entitlement to fees under § 285 by "clear and convincing evidence," [as is required for a determination of objectively baseless conduct]. We have not interpreted comparable fee-shifting statutes to require proof of entitlement to fees by clear and convincing evidence. And nothing in § 285 justifies such a high standard of proof. Section 285 demands a simple discretionary inquiry; it imposes no specific evidentiary burden, much less such a high one. Indeed, patent-infringement litigation has always been governed by a preponderance of the evidence standard, and that is the standard generally applicable in civil actions, because it allows both parties to share the risk of error in roughly equal fashion.

*Octane*, 572 U.S. at 556-58 (citations omitted).

The Court's holding in *Octane* indicates that the "exceptional case" standard under § 285 is less exacting than the *Noerr-Pennington* doctrine's sham litigation carve-out as defined in *PRE*. Federal courts have given a court's denial of attorney's fees under § 285 preclusive effect when determining whether a suit or series of suit constitutes sham litigation. *See Shuffle Tech Int'l LLC v. Scientific Games Corp.*, No. 15-3702, 2017 WL 3838096, at *7 (N.D. Ill. Sept. 1, 2017) (holding that plaintiffs "may be precluded from pursuing" a theory of sham litigation where the district court "already ruled on a key issue relevant to [the] theory of sham litigation: whether the suit . . . was objectively baseless"). Accordingly, as the district court has already determined – by a preponderance of the evidence – that the litigations are not exceptional, they cannot be said to be objectively baseless.

18

Notwithstanding the district court's rulings denying the various attorney's fees motions, it is clear that Akorn cannot demonstrate the litigations are objectively baseless. Even if Akorn had plausibly alleged that the *Latisse* litigations constituted sham litigations, it cannot satisfy the Third Circuit's "series test." *See Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*, 806 F.3d 162, 179-80 (3d Cir. 2015). When a party brings

> "a series of legal proceedings, . . . 'the question is not whether any one of them has merit – some may turn out to, just as a matter of chance, but whether they are brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival.'"

*Id.* at 180 (quoting *USS-POSCO Indus. v. Contra Costa Cty. Bldg. & Constr. Trades Council, AFL-CIO*, 31 F.3d 800, 811 (9th Cir. 1994)).

Furthermore, in determining whether a plaintiff had the improper purpose of "injuring a market rival," courts should consider the litigant's "filing success – i.e., win-loss percentage – as circumstantial evidence of [] subjective motivations." *Hanover*, 806 F.3d at 180-81. "If more than an insignificant number of filings have objective merit, a defendant likely did not have the policy of filing 'willy-nilly without regard to success.'" *Hanover*, 806 F.3d at 181 (quoting *USS-POSCO*, 31 F.3d at 811).

Here, Akorn cannot plausibly allege that the *Latisse* lawsuits were brought for the purpose of injuring a market rival. It is unquestionable that the lawsuits in both *Latisse I* and *II* had objective merit, as each sought to enforce patents whose validity had not yet been adjudicated by a court. Additionally, as this Court and the district court in *Latisse III* have each determined that the lawsuit in *Latisse III* was not objectively baseless, it is clear that "more than an insignificant number of [the] filings have objective merit." *Hanover*, 806 F.3d at 181. Accordingly, Akorn has failed to state a claim for monopolization by virtue of sham litigation, and Plaintiffs' Motion to Dismiss Counterclaims Four through Six is **GRANTED**.

19

### B. Conspiracy to Monopolize (Counterclaim Seven)

Plaintiffs contend this Court should dismiss Counterclaim Seven, asserting a cause of action for conspiracy to monopolize in violation of 15 U.S.C. §§ 1 and 2, as Akorn "fails to convert an ordinary patent license term into an unlawful conspiracy to monopolize claim." (ECF No. 22-1 at 18-20.) Akorn argues Plaintiffs' Motion to Dismiss Counterclaim Seven should be denied as it has sufficiently pled each element required for an unlawful conspiracy to monopolize claim and provided a factual basis for each element of its claim. (ECF No. 26 at 21-23.)

A conspiracy occurs when multiple defendants have "a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (quoting *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 111 (3d Cir. 1980)). To establish a conspiracy to monopolize claim pursuant to 15 U.S.C. § 1,[10] a party must prove "(1) concerted action by the defendants; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted actions were illegal; and (4) that it was injured as a proximate result of the concerted action." *Gordon v. Lewiston Hosp.*, 423 F.3d 184, 207 (3d Cir. 2005) (citations omitted). "Claims for conspiracy to monopolize under Section 2 of the Sherman Act also require evidence of a conspiracy," as "Section 2 . . . prohibits monopolization, attempts to monopolize and conspiracies to monopolize any part of interstate trade or commerce." *Id.* at 207 n.16.

In Counterclaim Seven, Akorn alleges: a concerted action in the form of an agreement to enforce the licensed patents – the '270 and '962 Patents – by filing multiple patent infringement actions against Akorn and its co-defendants (ECF No. 8 ¶¶ 209-12); producing the anti-competitive

---

[10] Title 15, Section 1 of the U.S. Code states, "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."

effect of fixing prices for Latisse while "restraining trade or commerce . . . by suppressing competition" (*id.* ¶¶ 213-14); this concerted action was illegal as it sought to use sham litigation to restrain trade and maintain Plaintiffs' monopoly (*id.* ¶¶ 215, 219); and Akorn suffered damages in the form of, *inter alia*, increased business costs "forestalling, frustrating and preventing Akorn's ability to compete in the relevant market" (*id.* ¶ 218).

First, Akorn fails to allege Plaintiffs' actions were illegal. Activities that are "in line with a wide swath of rational and anticompetitive business strategy [as] unilaterally prompted by common perceptions of the market" are inadequate to state a claim for conspiracy. *Twombly*, 550 U.S. at 545. As Akorn has failed to allege a claim for sham litigation, as discussed in this Court's analysis of Plaintiffs' Motion to Dismiss Counterclaims Four through Six, it necessarily cannot fulfill the third prong of the test explained in *Gordon*. Therefore, this Court must grant Plaintiff's Motion to Dismiss Counterclaim Seven.

Additionally, the Supreme Court has held that a corporation and its wholly-owned subsidiaries cannot conspire with one another as a matter of law because they feature a "complete unity of interest" rather than a "sudden joining of two independent sources of economic power previously pursuing separate interests." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 751, 771 (1984). Supreme Court jurisprudence teaches the "broader principle that substance, not form, should determine whether a separately incorporated entity is capable of conspiring under § 1." *Copperweld*, 467 U.S. at 773 n.21 (citing *Sunkist Growers, Inc. v. Winckler & Smith Citrus Prods. Co.*, 370 U.S. 19, 29 (1962)). Indeed, as a "general rule, a patent owner should be joined, either voluntarily or involuntarily, in any patent infringement suit brought by an exclusive licensee having fewer than all substantial patent rights." *Shionogi Pharma, Inc. v. Mylan, Inc.*, No. 10-1077, 2011 WL 2174499, at *5 (D. Del. May 26, 2011) (citations omitted). Accordingly, "district courts

have held that [] parties with unified interests, such as a patent holder and licensee, are incapable of conspiring [with one another for the purposes of 15 U.S.C. § 1]." *Id.* Here, as it is undisputed that Duke and Allergan have an exclusive patentee-license holder relationship, this Court must dismiss Counterclaim Seven.

Citing *Townshend v. Rockwell Int'l Corp.*, No. 99-400, 2000 WL 433505, at *6 (N.D. Cal. Mar. 28, 2000), Akorn argues that the issue of a party's capability to enter a conspiracy is a question of fact that cannot be resolved upon a Rule 12 motion. (ECF No. 26 at 22-23.) However, the decision in *Townshend*, which focused primarily on a Ninth Circuit holding inapplicable to this matter, involved a fraudulently obtained standard and the counterclaim-defendants' actions to block competitors from accessing patents needed to manufacture standard-compliant products. *Townshend*, 2000 WL 433505, at *6. The *Townshend* court was required to consider whether the counterclaim-defendants violated a specific and complex patent policy agreed upon by the parties, whereby the terms of such policy were in dispute. *Id.* Here, no such dispositive, fact-intensive inquiry exists. Similarly, this Court does not find the additional cases – none of which are binding authorities – to provide persuasive support to Akorn's position.[11] Accordingly, Akorn has failed to state a claim for conspiracy to monopolize and Plaintiffs' Motion to Dismiss Counterclaim Seven is **GRANTED**.

---

[11] In support of its position that an exclusive patentee-license holder relationship between the parties does not preclude suit under § 1, Akorn cited *Pecover v. Elec. Arts Inc.*, 633 F. Supp. 2d 976, 983-84 (N.D. Cal. 2009) and *In re EpiPen Mktg., Sales Practices & Antitrust Litig.*, 336 F. Supp. 3d 1256, 1301-02 (D. Kan. 2018). Unlike here, the plaintiff in *Pecover* challenged multiple agreements with competitors which allegedly "deprive[d] the marketplace of independent sources of economic power" and thereby prevented competition. *Pecover*, 633 F. Supp. 2d at 984. Meanwhile, the decision in *In re EpiPen* was between defendants who "compete[d] in the [same relevant] market" and where the challenged agreement allegedly went against one of the party's own self-interests. *In re EpiPen*, 336 F. Supp. 3d at 1302.

### C.  Patent Misuse (Counterclaim Eight)

Plaintiffs contend Akorn's Counterclaim Eight, asserting patent misuse, should be dismissed as Akorn fails to allege fraud – thereby premising its claim solely on sham litigation – and Akorn's assertions that Plaintiffs expanded the scope of their patents without any factual allegations falls short of the pleading standard in *Twombly*. (ECF No. 22-1 at 20-21.) Akorn argues it made specific allegations of Plaintiffs' attempt to expand the temporal or physical scope of the claims, and as such, dismissal at this juncture is unwarranted. (ECF No. 26 at 23-24.)

In "applying the Supreme Court's patent misuse decisions, [the Federal Circuit] ha[s] characterized patent misuse as the patentee's act of 'impermissibly broadening the physical or temporal scope of the patent grant with anticompetitive effect.'" *Princo Corp. v. Int'l Trade Com'n*, 616 F.3d 1318, 1328 (Fed. Cir. 2010) (quoting *Windsurfing Int'l, Inc. v. AMF, Inc.*, 782 F.2d 995, 1001 (Fed. Cir. 1986)). Where a patentee has "used restrictive conditions on licenses or sales to broaden the scope of the patent grant," the Federal Circuit has "held that an accused infringer may invoke the doctrine of patent misuse to defeat the patentee's claim." *Princo*, 616 F.3d at 1328 (citing *Monsanto Co. v. McFarling*, 363 F.3d 1336, 1341 (Fed. Cir. 2004)).

Certain activities constitute patent misuse *per se*, such as when a patentee with market power explicitly conditions a license under the patent on the purchase of other unpatentable goods. *See Virginia Panel Corp. v. MAC Panel Co.*, 133 F.3d 860, 869 (Fed. Cir. 1997). Meanwhile, other actions have been statutorily excluded from the doctrine of patent misuse even though they may have "anticompetitive effects." *See U.S. Philips Corp. v. Int'l Trade Com'n*, 424 F.3d 1178, 1185 (Fed. Cir. 2005). For example, 35 U.S.C. § 271(d)(3) allows a patent owner "to enforce his patent rights against infringement or contributory infringement of the patent." 35 U.S.C. § 271(d)(3). Similarly, the Federal Circuit has further held that it is "not patent misuse to bring suit to enforce

patent rights not fraudulently obtained." *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1373 (Fed. Cir. 1998).

Akorn has failed to adequately plead patent misuse. First, Akorn has failed entirely to allege fraud in Plaintiffs' obtaining of the various patents. As such, Akorn's patent misuse claim is premised entirely on its sham litigation allegations, which, as a matter of law, cannot for the basis of a patent misuse claim. *See Pace Int'l, LLC v. Indus. Ventilation, Inc.*, No. 08-1822, 2009 WL 2460999, at *1 (W.D. Wash. Aug. 6, 2009) (citing *C.R. Bard*, 157 F.3d at 1373)). Moreover, although Akorn alleges Plaintiffs "impermissibly broaden[ed] the scope of the '270 Patent" both "physically" and "temporally," thereby causing an "anticompetitive effect," Akorn offers absolutely no factual allegations to support this claim. (ECF No. 8 ¶¶ 228-31.)[12] Where a litigant fails to plead specifics as to how a defendant in a patent misuse action impermissibly broadened the physical or temporal scope of the patent, the patent misuse claim cannot withstand a motion to dismiss. *See Otsuka Pharm. Co. v. Torrent Pharm. Ltd., Inc.*, 118 F. Supp. 3d 646, 659 (D.N.J. 2015) (dismissing a patent misuse claim as it "hinge[d] upon [defendant's] allegedly bad faith conduct in pursuing its baseless patent infringement action" because it failed to plead how it "impermissibly broadened the physical or temporal scope of the [] patents with an anticompetitive effect"); *see also GoDaddy.com, LLC v. RPost Commc'ns Ltd.*, No. 14-126, 2014 WL 6908507, at *5 (D. Ariz. Dec. 9, 2014) (dismissing a patent misuse claim where the plaintiff "pled that [defendant] acted in bad faith without pleading any facts that indicate an impermissible broadening" of the patent). Accordingly, Akorn has failed to state a claim for patent misuse and

---

[12] Instead, Akorn merely alleges that a "reasonable litigant" would believe that Plaintiffs were collaterally estopped from asserting or contesting the invalidity of claims in the '270 Patent. (ECF No. 8 ¶ 229.) however, the '270 Patent was not issued until February 2017, and the claims of the '270 Patent itself have yet to be fully litigated on the merits. (ECF No. 1 ¶¶ 18, 64.)

Plaintiffs' Motion to Dismiss Counterclaim Eight is **GRANTED**.

### D.  Affirmative Defenses Seven Through Nine

Plaintiffs contend this Court should strike Akorn's Affirmative Defenses Seven, Eight, and Nine – asserting patent misuse, sham litigation, and conspiracy to violate 15 U.S.C. § 1, respectively – as they are deficient under Rule 8 and should be dismissed for the same reasons as the correlating counterclaims. (ECF No. 22-1 at 21-22.) Akorn argues Plaintiffs cannot plausibly claim they have not been provided sufficient notice of the bases for the affirmative defenses, the standard when considering a motion to strike an affirmative defense, and that as such, this Court should deny Plaintiffs' Motion to Strike. (ECF No. 26 at 24-25.)

"An affirmative defense can be stricken only if the defense asserted could not possibly prevent recovery under any pleaded or inferable set of facts." *Tonka*, 836 F. Supp. at 218 (citations omitted). Courts should strike pleadings only "sparingly," as it is a "drastic remedy" reserved for ensuring justice in appropriate circumstances. *United States v. Boston Scientific Neuromodulation Corp.*, No. 11-1210, 2014 WL 4402118, at *3 (D.N.J. Sept. 4, 2018) (citations omitted). "If there is any doubt as to whether a matter in a pleading should be stricken, the doubt should be resolved in favor of the pleading." *Id.* "The Third Circuit has yet to opine on whether the pleading standards under *Twombly* and *Iqbal* apply to the pleading of affirmative defenses, but the majority of district courts in this Circuit to address the issue have concluded they do not." *Malibu Media, LLC v. Does 1*, No. 12-2078, 2013 WL 1702549, at *2 (E.D. Pa. Mar. 6, 2013).

Notably, the Third Circuit has held:

> The purpose of requiring the defendant to plead available affirmative defenses in his answer [pursuant to Rule 8] is to avoid surprise and undue prejudice by providing the plaintiff with notice and the opportunity to demonstrate why the affirmative defenses should not succeed.

*Robinson v. Johnson*, 313 F.3d 128, 134-35 (3d Cir. 2002).

Here, although the standard for asserting an affirmative defense is less exacting than that to bring a claim, Akorn's affirmative defenses must be stricken on the same grounds on which this Court granted Plaintiffs' Motion to Dismiss Counterclaims Four through Six. *See Sonos, Inc. v. D&M Holdings Inc.*, No. 14-1330, 2016 WL 4249493, at *2 (holding an affirmative "defense may be deemed meritless because it is simply a conclusory allegation which fails to provide an appropriate statement of facts or to allege the necessary elements of the claims"). Akorn's affirmative defenses are mere redundant recitations of Counterclaims Four through Six, and therefore essentially require Akorn to prove the same elements as the correlating counterclaims in order to prevail. Moreover, although Plaintiffs were on notice of the defenses raised in the affirmative defenses, Plaintiffs have demonstrated why the defenses are meritless and should not succeed. Accordingly, Plaintiffs' Motion to Strike Affirmative Defenses Seven through Nine is **GRANTED.**

### E.  Motion to Bifurcate and Stay

As this Court has already granted Plaintiffs' Motion to Dismiss both Counterclaims Four through Six and Affirmative Defenses Seven through Nine, Plaintiffs' Motion to Bifurcate and Stay Akorn's Counterclaims Four through Six and Affirmative Defenses Seven through Nine is **DENIED AS MOOT**.

### IV.  CONCLUSION

For the reasons set forth above, Plaintiffs' Motion to Dismiss Counterclaims Four through Eight is **GRANTED** and Counterclaims Four through Eight are **DISMISSED WITHOUT PREJUDICE**, Plaintiffs' Motion to Strike Affirmative Defense Seven through Nine is

**GRANTED**, and Plaintiffs' Motion to Bifurcate and Stay Akorn's Counterclaims and Affirmative

Defenses is **DENIED AS MOOT**.


**Date: September 16, 2019**                    */s/ Brian R. Martinotti*
                                                **HON. BRIAN R. MARTINOTTI**
                                                **UNITED STATES DISTRICT JUDGE**

27